# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| TIMOTHY MORTARA, | : |
|  | : |
| Plaintiff, | : CIVIL ACTION NO. |
|  | : 3-05-cv-880 (JCH) |
|  | : |
| vs. | : |
|  | : NOVEMBER 16, 2007 |
| MARGARET KATKOCIN, in her individual | : |
| capacity and as First Selectman for the | : |
| Town of New Fairfield, and THE TOWN OF | : |
| NEW FAIRFIELD | : |
|  | : |
| Defendants. | : |

## RULING RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. No. 28), PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY (Doc. No. 33), and DEFENDANT'S MOTION TO STRIKE (Doc. No. 42)

Plaintiff, Timothy Mortara, brings his Complaint against the defendants, Margaret Katkocin, in her individual capacity and as the First Selectman for the Town of New Fairfield, and the Town of New Fairfield (collectively "defendants"), alleging violation of his rights under the First and Fourteenth Amendments to the Constitution, and violation of his rights under Connecticut General Statutes sections 31-51q and 31-51m. See Complaint (Doc. No. 1). This action stems from disciplinary actions against Mortara during his service as a police officer in the Town of New Fairfield ("the Town"). Id. The defendants move for summary judgment on all of Mortara's claims and move to strike portions of Mortara's Opposition to Defendants' Motion for Summary Judgment, portions of his 56(a)(2) Statement, and the entirety of his Motion for Summary Judgment. Mortara moves for summary judgment as to liability on all of his claims.

## I.  FACTS[1]

Timothy Mortara began working as a police officer for the Town of New Fairfield on December 31, 2001.  Mortara was a member of the New Fairfield Police Officers Union ("the Union") and a beneficiary of the Collective Bargaining Agreement ("CBA") between the Town and the Union.  Mortara was elected President of the Union in November of 2003.  From May 2002 until he became the Union President in November 2003, a period of eighteen months, Mortara did not receive any verbal or written warnings, counseling, or other discipline.  See Pl.'s 56(a)(1) Stat. at ¶ 10 (citing Katkocin Depo. at 103-108).

When Mortara started his career with the Town, Margaret Katkocin ("Katkocin") was serving as First Selectman for the Town of New Fairfield.  The Town of New Fairfield does not have a charter.  Its municipal government is governed by the Connecticut General Statutes applicable to municipal government, which define the role of the First Selectman.  As First Selectman, Katkocin served as the Chief Executive Officer of the Town and the Administrative Police Chief.

The Town is policed by a "blended force" of local police officers and Connecticut State Troopers pursuant to a contract between the Town and the Connecticut Department of Public Safety.  Def.s' 56(a)(1) Stat. of Material Facts ("Def.s' 56(a)(1) Stat.") at ¶ 8 (Doc. No. 33).   Mortara's immediate supervisor was Sergeant Wagnblas,

---

[1]For the purposes of the instant motion, the court accepts facts undisputed by the parties and supported by evidence as true and resolves disputed facts in favor of the non-moving party, where there is evidence to support its allegations.

who was a Trooper and not an employee of the Town during the relevant time period. While the parties dispute what role Sergeant Wagnblas played in disciplinary actions against police officers in the Town, they agree that Sergeant Wagnblas would advise Katkocin of any issue of police misconduct and that only Katkocin could decide if an officer would be disciplined.

For many years, debate raged in the Town about whether it should be policed by a purely local police force or a force consisting entirely of state troopers. This debate was "extremely public" and "well-known within the community." Pl.'s 56(a)(1) Statement of Material Facts ("Pl.'s 56(a)(1) Stat.") at ¶ 35 (Doc. No. 40). During this debate, Mayor Boughton of Danbury, Connecticut, approached Katkocin about the possibility of a joint venture between their police forces. Katkocin met with Mayor Boughton in early January 2004 to discuss the proposal. On February 2, 2004, Mortara, writing on behalf of the Union, on Union letterhead, and signing as the President of the Union, sent a letter to Mayor Boughton expressing the Union's support of the proposed "integration of the New Fairfield Police Department into the Operational Policies and Procedures of the Danbury Police Department." Letter from Mortara to Boughton ("Letter to Boughton"), Def.s' 56(a)(1) Stat., Ex. F.

Katkocin met with Mortara and Sergeant Wagnblas on February 5, 2006 to discuss the letter. Exactly what Katkocin said to Mortara at that meeting is disputed by the parties. Sergeant Wagnblas testified that Katkocin was "upset" at the meeting. Sergeant Wagnblas Deposition ("Wagnblas Depo.") at 29 (Doc. No. 50). While Wagnblas testified that he didn't "remember any actual words or details" he testified that he did remember Katkocin saying "[y]ou have absolutely no authority and I don't

3

give a good goddamn if every cop in this building told you to write that memo." Id. at 31-2. He recalls her saying, "Where the hell do you come off and where the hell does your executive board come off writing a memo to the Mayor of Danbury?" Id. at 32. He remembers her saying, "you have no statutory power, your Union rights and your Union issues and stands on the issues only pertain to the Town of New Fairfield, and you have no agreement or any statutory power or any relationship with the city of Danbury" and "I will defy [the Union's lawyer] or the Supreme Court Justice tell me you do." Id. at 33-4. He further recalls her saying, "you put yourself in jeopardy, because I'm taking disciplinary action against you, and if I can fire you, you will no longer be a police officer here, Tim." Id. at 34.

Katkocin denies that she made these last two statements. See Def.'s 56(a)(2) Statement of Material Facts ("Def.s' 56(a)(2) Stat.") at ¶¶ 58-9 (Doc. No. 40). Katkocin testified that she thinks she said, "if it were possible, I'm so angry that I would fire you, that's how angry this has made me, that's how serious I think this is." Katkocin Deposition ("Katkocin Depo.") at 89 (Doc. No. 47). She testified that she cannot recall whether or not she made reference to the Union lawyer or the Supreme Court during the meeting. Id. at 92.

On May 3, 2004, Officer Mortara received a request for an "explanatory" from Sergeant Wagnblas regarding a conversation Mortara had with Katkocin regarding the Field Training Program and not following the chain of command. An "explanatory" is a document sent by an officer to his supervisor to better explain a situation. Mortara was not disciplined following his submission of this explanatory.

On May 7, 2004, Officer Mortara submitted an explanatory at Sergeant

Wagnblas' request, explaining an email Mortara had sent to Gary Pfeifer of the POST Academy regarding firearms qualifications for police officers. The defendants assert that Mortara falsely claimed to be the "training officer" in this email; Mortara denies representing himself as such in the email. See Def.'s 56(a)(1) Stat. at ¶ 35, Pl.'s 56(a)(2) Stat. at ¶ 35. Sergeant Wagnblas reported this incident to Katkocin, who instructed him to issue Mortara a letter of reprimand for sending the email. Officer Mortara received a written reprimand on May 12, 2004.

On May 19, 2004, Mortara received a verbal reprimand for working unauthorized overtime. The defendants claim that Sergeant Wagnblas had issued several memos telling officers that they must receive permission before working overtime; Mortara denies that these memos were issued prior to his receiving this discipline. See Def.'s 56(a)(1) Stat. at ¶ 39 and Pl.'s 56(a)(2) Stat. at ¶ 39. While the parties disagree as to whether these memos were issued, they agree that there was no formally adopted, written policy in the Town regarding the proper approval for working overtime.

In June, 2004, Officer Mortara received verbal and written counseling for improperly completing reports and filing reports late. On July 27, 2004, Mortara received a letter of reprimand for improperly completing accident reports.

On August 11, 2004, Sergeant Wagnblas sent Ms. Katkocin a memo detailing the history of his instructions to Mortara regarding the proper manner for completing reports, and indicating specific incidences where he believed Mortara's reports had been deficient. On August 11, 2004, Mortara received a three-day suspension without pay from Katkocin for disregarding the procedure for completing motor vehicle accident reports.

On September 30, 2004, Officer Mortara made an arrest in Danbury on an outstanding misdemeanor warrant.  He was accompanied by Officer D'Imperio, as an off-duty observer.  That same day, Sergeant Wagnblas requested an explanatory, asking why Mortara did not notify him that he was leaving the Town to effectuate an arrest, why he thought he had authorization to take an off-duty officer with him, and why his report of the incident was late.  Also that same day, Sergeant Wagnblas sent Mortara a memo regarding the proper procedures for making an arrest outside of the Town.  On October 12, 2004 Sergeant Wagnblas sent an additional memo clarifying this procedure.  That same day, Officer Mortara submitted an explanatory about the incident to Sergeant Wagnblas.  On October 25, 2004, Sergeant Wagnblas provided Katkocin with a report on the incident and how it violated procedures. He suggested that Mortara be disciplined.  The parties agree that Mortara had statutory authority to serve the arrest warrant in another jurisdiction; however, Sergeant Wagnblas found the actions to be "unsafe" and in violation of "standard operating procedure."  Def.s' 56(a)(1) at ¶ 64.  On January 2, 2005, Mortara received a five-day suspension without pay as discipline for this incident.

On April 25, 2005, Sergeant Wagnblas informed Katkocin that Mortara had installed unlicensed software one of the Town's police vehicle computers and recommended that he be disciplined.  Officer Mortara admitted installing the software and that he had not notified Sergeant Wagnblas or asked his permission before doing so.  On June 3, 2005, Katkocin issued Mortara a five-day suspension.

On February 21, 2005 Sergeant Wagnblas requested an explanatory from Mortara as to why Mortara did not complete an evading accident report from a caller.

Officer Mortara submitted this explanatory on February 22, 2005 denying that the caller wanted to give a written statement and pursue a formal complaint. On March 10, 2005, Sergeant Wagnblas requested an explanatory from Officer Mortara asking why he did not initiate a case number concerning a criminal mischief call. Officer Mortara submitted this explanatory on March 23, 2005, denying any wrongdoing. On April 25, 2005, Sergeant Wagnblas wrote a memo to Katkocin recommending that Mortara be disciplined. On April 29, 2005, Katkocin sent a letter to Mortara advising him that she was considering discipline "up to and including termination of employment." Pl.'s 56(a)(1) Stat. at ¶ 100. On June 3, 2005, Katkocin issued Mortara a ten-day suspension without pay.

According to Officer Mortara, he submitted grievances regarding the written reprimand that he received on May 12, 2004 and the written reprimand he received on July 27, 2004. See Plaintiff's Supplemental Response to Defendant's First Set of Interrogatories and Requests for Production at 24-5, Ex. G to Def.'s 56(a)(1) Stat. These grievances were filed pursuant to Article 8 of the CBA, which provided for a three step grievance process, the third step of which was an arbitration hearing before the Board of Mediation and Arbitration.        

## II.    STANDARD OF REVIEW ON MOTION FOR SUMMARY JUDGMENT

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgement as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). Once the moving party has met its burden, the nonmoving party must "set forth specific facts

showing that there is a genuine issue for trial," <u>Anderson</u>, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor in order to defeat the motion. <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  <u>Anderson</u>, 477 U.S. at 255; <u>Graham</u>, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."  <u>Carlton</u>, 202 F.3d at 134.  "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury.  <u>Sologub v. City of New York</u>, 202 F.3d 175, 178 (2d Cir. 2000).

## III.    DISCUSSION

### A.    Mortara's First Amendment Speech Claim (Counts One, Four and Seven)

It is well-accepted that "public employees do not surrender all their First Amendment rights by reason of their employment."  Garcetti v. Ceballos, __ U.S. __, 126 S. Ct. 1951, 1957 (2006).  However, "[i]n measuring the extent of this right, the interests that must be carefully balanced are the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  Sheppard v. Beerman, 317 F.3d 351, 355 (2d Cir. 2003) (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)).  As a threshold matter, a public employee seeking to establish a First Amendment retaliation claim must show that, "(1)

his speech addressed a matter of public concern, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech and that adverse employment decision, so that it can be said that the plaintiff's speech was a motivating factor in the adverse employment action." Cioffi v. Averill Park Central School District Board of Ed., 444 F.3d 158, 162 (2d Cir. 2006)(citing Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)). Even if a plaintiff produces evidence of these three elements, a defendant may still "escape liability" by "demonstrating by a preponderance of the evidence that it would have taken the same adverse action in the absence of the protected speech" or by showing that "the plaintiff's speech was likely to disrupt the government's activities, and the likely disruption was sufficient to outweigh the First Amendment value of plaintiff's speech." Mandell v. County of Suffolk, 316 F.3d 368, 383 (2d Cir. 2003)(internal quotations omitted).

Turning to the elements that Mortara must establish,[2] the first question for the court is whether Officer Mortara spoke "as a citizen upon matters of public concern" or "as an employee upon matters of personal interest." Connick v. Myers, 461 U.S. 138, 147 (1983); see also Melzer v. Bd. of Ed., 336 F.3d 185, 193 (2d Cir. 2003). This determination is made based on the "content, form, and context of a given statement, as revealed by the whole record." Cioffi, 444 F.3d at 163 (quoting Connick, 461 U.S. at 147-8)). The First Amendment generally protects "any matter of political, social or other

---

[2]The defendants do not argue in their briefs on these cross-motions for summary judgment that the suspensions Officer Mortara received did not constitute adverse employment actions, so the court need only address the other two elements Mortara must establish. See Washington v. County of Rockland, 373 F.3d 310, 320 (2d Cir. 2004)(holding that disciplinary proceedings and suspensions could constitute an adverse employment action in a first amendment retaliation action).

concern to the community."  Id. at 163-4.

Mortara claims that he was retaliated against because of a letter that he sent, in his capacity as the Union President of the New Fairfield Police Union, to Mayor Boughton of Danbury.[3]  See Pl.'s Mem. in Opp. at 17, Pl.'s Mem. in Supp. at 18 and, Letter to Boughton, Def.'s 56(a)(1) Stat., Ex. F.  The court finds that the content, form and context of this letter all require a finding that this letter was speech by a concerned citizen on a matter of public concern.  The content of the letter is the Union's position on the dialogue between the Town of New Fairfield and the Town of Danbury on integrating their police departments.  See id.  According to Katkocin, the future of the Town of New Fairfield's police department had been a hotly contested public issue for several years, and was the subject of public debate at the time Mortara wrote his letter. See Katkocin Depo. at 22 and 73.  Given this context, there can be no doubt that the potential merger was a matter of public concern.  Furthermore, the form of the letter, written on Union letterhead and signed "The New Fairfield Police Union Executive Board," demonstrates that this letter was not sent by Officer Mortara in the course of his employment as an Officer, but was sent in his capacity as the Union President.  Thus, Mortara was not speaking as an employee but as a "private citizen."  Letter to Boughton, Def.'s 56(a)(1) Stat., Ex. F.

---

[3]The court notes that Mortara argues that the grievances he filed on behalf of the union were also protected speech.  See Pl.'s Reply at 4 (Doc. No. 45).  However, Mortara raises this possibility for the first time in his Reply to the defendant's Opposition therefore depriving defendants of the opportunity to respond to this argument.  As the court finds that there is a material issue of fact as to whether the defendant's unlawfully retaliated against Mortara solely for writing the letter to Mayor Boughton such that summary judgment for the defendants on that issue is precluded, the court will not address the question of whether the grievances Mortara submitted as union president were also protected speech.

The second question is whether "a causal connection exists between his speech and that adverse employment decision, so that it can be said that the plaintiff's speech was a motivating factor in the adverse employment action."  Cioffi, 444 F.3d at 162. Causation "can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus."  Mandell v. County of Suffolk, 316 F.3d 368, 383 (2d Cir. 2003).  To establish a causal connection, a plaintiff must "aver some tangible proof demonstrating that their protected speech animated [the decision to take the adverse employment action]."  Washington, 373 F.3d at 321(internal quotations omitted).  He may not merely "rely on conclusory assertions of retaliatory motive."  Id. (internal quotations omitted).

Mortara argues that Katkocin's statements to him during the meeting they had with Sergeant Wagnblas on February 5, 2004, show that she had retaliatory animus towards him for writing the letter to Mayor Boughton.  See Pl.'s Mem. in Supp. at 21. Specifically, Mortara testified that, at the February meeting, Katkocin told him that "she would defy the union attorney or the Supreme Court to say I had a right to contact an elected official, and that she was taking disciplinary action against me for doing so. And she was going to fire me."  Mortara Depo. at 45.  Mortara's allegations as to Katkocin's threats at this meeting are largely supported by Sergeant Wagnblas's recollection of the meeting.  See Wagnblas Depo. at 34, Pl.'s Mot. for Summ. Judg., Amended Ex. 3 (Doc. 50).

Defendants argue that Mortara has failed to show a causal connection because, in part, the suspension were more than three months after the February meeting.  See

Def.'s Mem. in Supp. at 14 and Def.'s Mem. in Opp. at 10.  However, where a plaintiff asserts enough direct evidence of retaliatory animus to create a triable question of fact on the issue of a causal connection, a longer lapse between the protected speech and the adverse employment action does not necessarily "conclusively establish lack of causation."  Mandell, 316 F.3d at 384.  In this case, Mortara received notice of his first suspension on August 11, 2004, six months after he sent the letter to Mayor Boughton.  See Pl.'s 56(a)(1) Stat. ¶ 79.  Six months is not such a long delay as to preclude the possibility that a trier of fact could find a causal connection between the protected speech and the adverse employment action.[4]

Satisfied that Mortara has produced sufficient evidence to establish a First Amendment retaliation claim, the court must then determine whether the defendants have shown that it would have taken the adverse employment actions in the absence of the protected speech, or that the speech was likely to disrupt the government's activities such that the disruption was "sufficient to outweigh the First Amendment value of plaintiff's speech."  Mandell, 316 F.3d at 382-3.

The defendants argue that Katkocin would have disciplined Officer Mortara even in the absence of his protected speech.  See Def.'s Mem. in Opp. at 12-4 and Def.'s Mem. in Supp. at 15-7.  In order to grant summary judgment to the defendants on

---

[4]The court notes that Mortara points to other events, that occurred between the February meeting and the first adverse employment action, that may be indicative of retaliatory intent.  See Pl.'s Mem. in Supp. at 6-8.  However, because the court finds that Mortara's evidence of Katkocin's statements at the meeting followed six months later by an adverse employment action is sufficient to create an issue of material fact as to a causal connection, the court need not consider whether a reasonable trier of fact could find that these actions further support a causal connection.

Mortara's First Amendment speech claim, the court would have to find that the defendants have "shown by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct." Mt. Healthy City School District Board of Ed. v. Doyle, 429 U.S. 274, 287 (1977). However, where "questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision," summary judgement is precluded. Morris v. Landau, 196 F.3d 102, 110 (2d Cir. 1999)(internal quotation omitted).

Reviewing the evidence in the light most favorable to Mortara for the purposes of deciding the defendants' Motion for Summary Judgment, the court finds that Mortara has produced evidence sufficient to establish that there is a disputed issue of fact as to whether the defendants would have disciplined Mortara absent his protected speech. First, from May 2002 until he became the Union President in November 2003, a period of eighteen months, Mortara received no verbal or written warnings, counseling, or other discipline. See Pl.'s 56(a)(1) Stat. at ¶ 10 (citing Katkocin Depo. at 103-108). In contrast, Officer Mortara received reprimands or other disciplinary actions at least six times between the eight month period of May 12, 2004 and January 5, 2005. See Pl.'s 56(a)(1) Stat. at ¶¶ 70, 73, 76, 78, 79, 87.

Second, Mortara has submitted evidence that raises an issue of fact as to whether at least one of his suspensions for failing to follow procedure in serving an arrest warrant outside of the Town of New Fairfield was pretextual. See Letter from Katkocin to Mortara, Def.'s 56(a)(1) Stat. Ex. P, Def.'s 56(a)(1) Stat. at ¶ 57 and Pl.'s 56(a)(2) Stat. at ¶ 57. Mortara argues that the policy for making arrests outside of the

Town could not have been clear before he was disciplined for violating it because Sergeant Wagnblas issued a memo on October 12, 2004 attempting to "clarify" the September 30, 2004 memo he issued on the same subject. See Pl.'s Mem. in Supp. Ex. 1, Complaint Ex. 22. In reporting the September 30, 2004 incident to Katkocin, Sergeant Wagnblas indicates that Officer Mortara violated "standard operating procedure," but makes no reference to what that procedure would be. Letter from Wagnblas to Katkocin, Def.'s 56(a)(1) Stat. at Ex. Q. In his deposition, Sergeant Wagnblas indicated that he did not know if the policy requiring officers to take a "jurisdictional officer" or State Trooper with them to make arrests outside of the Town was a written policy or not. Wagnblas Depo. at 84. While this evidence does not preclude the possibility that the defendants would have taken this adverse employment actions regardless of Mortara's protected speech, it does raise an issue of material fact as to that question that is properly reserved for the fact finder.

Finally, the court finds no merit in the defendants' argument that they cannot be held liable for retaliating against Mortara because Katkocin was concerned that Mortara's letter would "interfere with government operations." Def.'s Mem. in Opp. at 15. The government may fire an employee for speaking on a matter of public concern if: "(1) the employer's prediction of disruption is reasonable; (2) the potential disruptiveness is enough to outweigh the value of the speech; and (3) the employer took action against the employee based on this disruption and not in retaliation for the speech." Jeffries v. Harlston, 52 F.3d 9, 13 (2d Cir. 1995)(internal quotations omitted). The defendants have offered no evidence to support a finding that Katkocin believed that Mortara's letter would disrupt government operations. Instead, they argue merely

14

that Katkocin was concerned that Mortara's letter might "exacerbate" tensions within the Town of New Fairfield regarding the private negotiations Katkocin was having with Mayor Boughton. Def.'s Mem. in Opp. at 15. Nowhere does Katkocin state that she was concerned that the operations of the Town of New Fairfield Police would be disrupted by Mortara's letter; she only claims that the sensitive nature of her negotiations might be ruined. As such, the defendants have not provided sufficient evidence to avoid liability under the theory that they retaliated against Mortara to avoid disruption of government operations.

Having concluded that an issue of material fact exists as to whether Katkocin retaliated against Mortara for sending the letter to Mayor Boughton, Mortara's motion for Summary Judgment as to this count is denied.

### B.    Mortara's First Amendment Association Claim

The Second Circuit has held that the requirement that speech be on a "matter of public concern" also applies to associational conduct in claims asserting a violation of the First Amendment right to freedom of association. Cobb v. Pozzi, 363 F.3d 89, 102 (2d Cir. 2004). Therefore, whether an associational claim addresses a matter of public concern is similarly "determined by the content, form and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-8.

In Clue v. Johnson, 179 F.3d 57, 61 (2d Cir. 1999), the Second Circuit held that "retaliation solely for union activity raises a public concern under Connick." Id. at 61 (internal quotation omitted). While the Clue opinion does not address why this should be the case, the reasoning of Connick supports the holding. See Connick, 461 U.S. at 144-5. The Connick Court reviewed Supreme Court First Amendment precedents

15

leading up to <u>Pickering</u> and found that the issue in those cases was "whether government employees could be prevented or chilled by the fear of discharge from joining political parties and other associations that certain public officials might find subversive." <u>Connick</u>, 461 U.S. at 145 (internal quotations omitted). Those decisions found that the right of public officials to participate in public affairs was grounded in one purpose of the First Amendment protection of speech, which was "to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." <u>Id.</u> (citing <u>Roth v. United States</u>, 354 U.S. 476, 484 <u>and</u> <u>New York Times Co. v. Sullivan</u>, 376 U.S. 254, 269 (1964)). Such speech on public issues is "more than self-expression; it is the essence of self-government" and as such "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." <u>Id.</u> (internal quotations omitted). Union organizing is clearly the type of associational activity directed at "political and social changes" that government censorship might chill.

However, the court agrees with the Sixth Circuit that "an employee's speech, activity or association, merely because it is union-related, does not touch on a matter of public concern as a matter of law." <u>Boals v. Gray</u>, 775 F.2d 686, 693 (6th Cir. 1985). The burden is on Mortara to show that his union activities were associational activities of public concern. <u>See</u> <u>Cobb</u>, 363 F.3d at 102 ("a public employee bringing a First Amendment freedom of association claim must persuade a court that the associational conduct at issue touches on a matter of public concern.").

The court finds that Mortara's letter to Mayor Boughton was "core union activity" that is associational conduct on a matter of public concern. <u>See</u> <u>Clue</u>, 179 F.3d at 61(finding of first amendment claim based on determination that actions consituted

"core union activity').   Mortara's letter was clearly pursuant to his role as Union

president and on a subject of concern to the Union.  <u>See</u> Mortara's letter to Mayor

Boughton, Def.'s 56(a)(1) Stat., Ex. F.  Katkocin's own testimony about the public

debate around the issue of the police department's future belies the merit of

defendants' assertion that the letter was merely about "an internal union interest."  <u>See</u>

Katkocin Deposition at 22 and 73.

Because the subject of Mortara's First Amendment speech claim and his first

amendment associational claim are both the letter he sent in his capacity as Union

president to Mayor Boughton, the rest of the analysis on Mortara's First Amendment

association claim is the same as the analysis of his First Amendment speech claim.

Thus, the court concludes that there is a disputed issue of material fact as to whether

Katkocin retaliated against Mortara based on his union activity.  <u>See</u> infra.  Therefore,

Mortara's Motion for Summary Judgment as to his First Amendment association claim

is denied.

### C.    Mortara's Fourteenth Amendment Due Process Claim

The standard two part test for a procedural due process claim is, 1) whether the

plaintiff asserts a property interest protected by the Constitution and 2) whether the

defendant deprived plaintiff of that property interest without due process.  <u>See</u> <u>Strong v.</u>

<u>Board of Education</u>, 902 F.2d 208, 211 (2d Cir. 1990).  The United States Supreme

Court and the Second Circuit have held that sources independent of the Constitution --

most often state law -- define property or liberty interests entitled to the protections of

procedural due process.  <u>Ezekwo v. NYC Health and Hospitals Corporation</u>, 940 F.2d

775, 782 (2d Cir. 1991) (citing <u>Board of Regents v. Roth</u>, 408 U.S. 564, 577 (1972)).  A

person has a property or liberty interest for due process purposes if there are rules or mutually explicit understandings that support his legitimate claim of entitlement to the interest.  Id.  The parties agree that Mortara satisfies the first prong because as a public employee he had a property interest in his employment, and that he was deprived of that interest when he was suspended without pay.[5]  See Def.'s Mem. in Supp. at 19-20; see e.g. O'Connor v. Pierson, 426 F.3d 187, 197 (2d Cir. 2005)(finding that although Supreme Court "had not decided whether procedural due process protections extend to employee discipline short of termination, we have done so in the case of tenured state employee's suspension without pay.")(internal quotation omitted).  Therefore, the court will turn to the question of whether Mortara was deprived of that property interest without due process.

The defendants argue that Mortara received all the pre-deprivation process required by the constitution.  See Def.'s Mem. in Supp. at 20.  Pre-deprivation process "need not be elaborate."  O'Connor v. Pierson, 426, F.3d 187, 198 (2d Cir. 2005)(quoting Cleveland Board of Ed. v. Loudermill, 470 U.S. 532, 545 (1985)).  Because the purpose of pre-deprivation process is to "serve as an initial check against mistaken decisions," the Constitution "mandates only that such process include, at a

---

[5]It is unclear from Mortara's briefs whether he argues that he had a property right implicated by every disciplinary action taken against him, or just the suspensions he received without pay.  See Pl.'s Mem. in Supp. at 29 (stating that "[a]ll grievances brought by Plaintiff regarding disciplinary investigations and charges against him by his harrassers were controlled and handled by Defendants" and later in the same paragraph stating that, "Plaintiff's unwarranted discipline can be established and qualifies as a deprivation of a property right."). Mortara makes no argument, and cites no case law supporting a conclusion, that he had a property right implicated by discipline short of suspension without pay, therefore the court concludes that his procedural due process claim is limited to those instances where he was suspended without pay.

minimum, notice and the opportunity to be respond." <u>Id.</u> (quoting <u>Loudermill</u>, 470 U.S. at 545). The defendants assert that Mortara was given notice of every disciplinary incident and the opportunity to respond by way of writing an "explanatory" to his supervisor explaining his actions. <u>See</u> Def.'s Mem. in Supp. at 20. It does not appear that Mortara disputes that this specific pre-deprivation process was available to him, but instead makes the blanket assertion that he "had no adequate procedural hearing or right to review any of the discipline he received either pre or post-hearing." Pl.'s Mem. in Supp. at 29. The court finds that the defendants point to sufficient evidence to establish that Mortara was given notice of potential disciplinary actions and was given an opportunity to respond to them. The court further finds that Mortara has not produced evidence to demonstrate that any issue of material fact exists as to whether he was given adequate pre-deprivation process; his procedural due process claim cannot stand on that ground.

Having determined that there is no issue of material fact as to whether Mortara received adequate pre-deprivation process, the court now turns to the question of whether he received adequate post-deprivation process. The Supreme Court has stated that, "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." <u>Matthews v. Eldridge</u>, 424 U.S. 319, 333 (1976). The Court has "consistently" found that "some form of hearing" is required to satisfy that opportunity to be heard. <u>Id.</u> The defendants assert that Mortara was guaranteed constitutionally valid post-deprivation process pursuant to the Collective Bargaining Agreement (CBA). <u>See</u> Def.'s Mem. in Supp. at 11. The CBA governing Mortara's disciplinary actions provides for a three-step process culminating in

submission of the grievance to the "Board of Mediation and Arbitration."[6]  Such CBA-mandated procedures are "routinely (though not always) held to provide adequate post-deprivation process."  O'Connor 426 F.3d at 198; see also Harhay v. Town of Ellington Board of Ed., 323 F.3d 206, 213(2d Cir. 2003) (finding that a CBA grievance procedure providing for arbitration satisfied due process); Narumanchi v. Board of Trustees of the Connecticut State Univ., 850 F.2d 70, 72 (2d Cir. 1988).

Mortara's only complaint about the constitutionality of the post-deprivation process available to him is that he was denied "a fair hearing and opportunity to be heard on his complaints before an unbiased tribunal."  Pl.'s Mem. in Opp. at 27.  The court need not examine whether the first two steps of the post-deprivation grievance procedure are indeed biased as Mortara argues, because Mortara does not suggest that the hearing before the Board of Mediation provided for as the third step of the grievance process under the CBA is biased, insufficient to satisfy due process, or unavailable to him.  Mortara's only mention of this panel is that such an arbitration panel "would have been presented with the fraudulent disciplinary record created by the Defendants."  Pl.'s Reply at 8.  This assertion does nothing to undermine the defendants' assertion that the Board of Mediation option presented Mortara with the opportunity to refute that allegedly fraudulent record before an impartial tribunal.  See Withrow v. Larkin, 421 U.S. 35, 46 (1975)("a fair trial in a fair tribunal is a basic

---

[6]The court notes that Step Three of the grievance process appears to be available only if the Union, rather than the employee, chooses to pursue it.  See CBA § 8.01, Def.'s 56(a)(1), Ex. V.  However, Mortara has offered no evidence that the Union was unwilling to pursue this step at any time, or that this fact in any way limited his access to the third step of the grievance process.

requirement of due process").

Defendants have presented evidence that the third step in the grievance process afforded Mortara a meaningful opportunity to be heard by an impartial tribunal; Mortara has failed to submit any evidence to controvert this evidence. Therefore, there is no issue of material fact as to Mortara's due process claim, defendants are granted summary judgment as to that claim, and plaintiff's request for summary judgment as to that claim is denied.

### D. Qualified Immunity

Katkocin, in her individual capacity, moves for summary judgment on qualified immunity grounds. The court considers that ground with respect to the First Amendment claims, which are the only federal claims remaining against her.

Generally, qualified immunity insulates government officials from personal liability when they perform discretionary duties pursuant to their official functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The purpose of qualified immunity is to shield government officials 'from liability for their performance of discretionary actions and offers them the benefit of avoiding costly, time-consuming and, ultimately unsuccessful litigation." Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002). Determining whether an official has qualified immunity is a three part inquiry. See Munafo v. Metropolitan Transportation Auth., 285 F.3d 201, 210 (2d Cir. 20002). A government official is entitled to qualified immunity "(1) if the conduct attributed to [her] was not prohibited by federal law; or (2) whether that conduct was so prohibited, if the plaintiff's right not to be subjected to such

21

conduct by the defendant was not clearly established at the time it occured; or (3) if the defendant's action was objectively reasonable in light of the legal rules that were clearly established at the time it was taken." Id. (internal quotations omitted).

First, the court must ask if, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a consitutional right." Saucier v. Katz, 533 U.S. 194, 201 (2001). As indicated earlier, see sections III.A and B, supra., the court finds that, when the record is construed in a light most favorable to Mortara, an issue of fact exists regarding a violation of his constitutional rights to free speech and association. Therefore, the court will turn to the second two steps of the inquiry, looking at each of the remaining claims independently.

### 1. First Amendment Speech Claim

The second step in the determination of whether a government official is entitled to qualified immunity is whether the right alleged to have been violated was "clearly established." Id. Determining whether the right was "clearly established" must be done in light of the specific context of the case, "not as a broad general proposition." Id. According to the Second Circuit, "[i]t has long been established that a government employee's right to speak on issues of public concern is protected from retaliation if the speech does not disrupt the administration of the government." Catletti v. Rampe, 334 V.3d 225, 231 (2d Cir. 2003). Katkocin makes no argument that persuades the court that it was not "clearly established" that Mortara's letter was speech on a matter of public concern for which retaliation would be unlawful, nor does she assert that his letter disrupted the administration of the governmnet.

Katkocin would still be entitled to qualified immunity if her actions were

"objectively reasonable" in light of the legal rules clearly established at the time. However, where the defendant's intent is an element of the claim, "it can never be objectively reasonable for a government official to act with the intent that is prohibited by law." <u>Locurto v. Safir</u>, 264 F.3d 154, 169 (2d Cir. 2001). The Second Circuit has explained that to accept Katkocin's argument that it her actions were "objectively reasonable" would "effectively immunize all defendants in cases involving motive-based constitutional torts, so long as they could point to objective evidence showing that a reasonable official could have acted on legitimate grounds." <u>Id.</u> (internal quotations omitted). In cases such as this one, "[w]here a factual issue exists on the issue of motive or intent, a defendant's motion for summary judgment on the basis of qualified immunity must fail." <u>Johnson v. Ganim</u>, 342 F.3d 105, 117 (2003). Therefore, in this case, because "specific intent of a defendant is an element of plaintiff's claim under clearly established law, and plaintiff has adduced sufficient evidence of that intent to defeat summary judgment, summary judgment on qualified immunity grounds is inappropriate." <u>Mandell v. County of Suffolk</u>, 316 F.3d 368 (2d Cir. 2002).

### 2. First Amendment Association Claim

Katkocin asserts that she should be granted qualified immunity on Mortara's First Amendment association claim. <u>See</u> Def.'s Mem. in Supp. at 26-7 and Def.'s Mem. in Opp. at 24. Katkocin's argument in support of her assertion is that,

> it was not clear that Mr. Mortara's letter could form the basis for his freedom of association claim. As Union president, Mr. Mortara was responsible for overseeing and enforcing the collective bargaining agreement, and dealing with the Town in that regard. He did not have any responsibilities beyond the Town or the local or national unions. Accordingly, his letter to Mayor Boughton fell outside the scope of his duties. It was not clearly established that purported "union" conduct that

exceeded the scope of the union's responsibilities was protected under the first amendment.

Id.

Qualified immunity is an affirmative defense. See Zellner v. Summerlin, 494 F.3d 344, 368. As such, "it is incumbent upon the defendant to plead, and adequately develop, a qualified immunity defense during pretrial proceedings . . . ." Id. Katkocin's bald assertions, without a single reference to the record before the court or to any case law, are not sufficient for the court to determine whether or not she is entitled to qualified immunity on Mortara's First Amendment association claim. Therefore, her request for summary judgment as to this claim on the basis of qualified immunity is denied.

### E. Municipal Liability under section 1983

Mortara asserts his consititutional claims against the Katcokin in her official capacity as the First Selectman of the Town of New Fairfield (Counts Four, Five and Six) and against the Town of New Fairfield (Counts Seven, Eight and Nine). See Complaint at 24-31. The defendants argue that neither the Town, nor Katcokin in her official capacity,[7] may be held liable under section 1983 because Mortara seeks to hold the Town liable for Katkocin's actions pursuant to a theory of respondeat superior in violation of the Supreme Court's holding in Monell v. Department of Social Services of

---

[7]"It is well settled law that an action against a government official in his or her official capacity is not an action against the official, but instead is one against the official's office and, thus, is treated as an action against the entity itself." Therefore, the court will treat the claims against Katkocin in her official capacity and the claims against the Town as the same. Kelly v. City of New Haven, 275 Conn. 580, 595 (2005)(citing Monell, 436 U.S. at 691 n.55 (". . . official capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent. . . .")).

the City of New York, 436 U.S. 658 (1978).  See Def.'s Mem. in Supp. at 29.  The court

has already granted the defendants summary judgment as to Mortara's due process

claim; therefore, it need only address the question of municiple liability for Mortara's

First Amendment claims.

For a municipality to be liable under section 1983, the act that caused the

violation of rights must have been committed pursuant to an official policy or custom.

Monell, 436 U.S. at 691-94.  Further, "[t]he official policy must be the 'moving force of

the constitutional violation.'"  Goldberg v. Town of Rocky Hill, 973 F.2d 70 (2d Cir. 1992)

(quoting Monell, 436 U.S. at 694).  While a municipality can be held liable for a

constitutional violation asserted in a claim under section 1983, liability cannot rest on a

theory of respondeat superior.  Jeffes v. Barnes, 208 F.3d 49, 56-57 (2d Cir. 2000)

(citing Monell, 436 U.S. at 694).  In fact, avoiding results that are indistinguishable from

respondeat superior appears to be a primary concern of Supreme Court jurisprudence

on municipal liability.  See, e.g., St. Louis v. Praprotnik, 485 U.S. 112, 126

(1988)(plurality opinion)("If the mere exercise of discretion by an employee could give

rise to a constitutional violation, the result would be indistinguishable from respondeat

superior liability.").

Where the act did not result from official municipal policy, the municipality may

still be held liable where the injury is caused by one of its lawmakers or "'by those

whose edicts or acts may fairly be said to represent official policy.'"  Jeffes, 208 F.3d at

57(quoting Praprotnik, 485 U.S. at 121-22).  "Where the contention is not that the

actions complained of were taken pursuant to a local policy that was formally adopted

or ratified, but rather that they were taken or caused by an official whose actions

25

represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved." Id.

The question before the court is whether Katkocin was a final policymaker so as to render the City liable for her actions or inactions. Whether an official in question possessed final policy making authority in a particular area is a legal question to be determined by reference to state law, local law, and custom and usage having the force of law. Jeffes, 208 F.3d at 57-58. The Supreme Court has provided some general principles to guide the court in its consideration:

> When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies.

Praprotnik, 485 U.S. at 127. The plaintiff bears the burden of establishing that "the conduct of a given official represents official policy." Jeffes, 208 F.3d at 57.

To support his claim that Katkocin was a "final policy maker," Mortara offers evidence in the form of deposition testimony from Katkocin, and from John Hodge, the current First Selectman of the Town. See Pl.'s 56(a)(1) Stat. at ¶¶ 13, 14, 16, 21 and 22. In this deposition, Katkocin testified that "all of the town employees report directly to the First Selectman," and that "the First Selectman serves as the Chief of Police." Katkocin Depo. at 12. Hodge testified that the Town has no charter, and that the duties of the First Selectman are dictated by Connecticut State Statute. See Deposition of John Hodge at 13-4 (Doc. No. 49). Mortara cites Connecticut General Statute § 7-12a, which states that ". . . the first selectman, in each town for which its board of selectman

is the executive authority, shall be the chief executive officer of such town . . . ." CONN. GEN. STAT. § 7-12a.  Hodge further testified that "staffing issues" were an area where he could "set policy" without requiring the agreement of the other members of the Board of Selectman.  Hodge Depo. at 12.  As defendants themselves point out, the responsibility to discipline police officers in the Town "fell to the First Selectman" who would decide "whether any discipline should be issued."  Def.'s Mem. in Supp. at 3 (citing Wagnblas Depo. at 18 and 41).

In contrast, the defendants argue that '[t]he Town operates under a Board of Selectman-Town Meeting form of government with the town meeting being the legislative body.  Ms. Katkocin's independent actions therefore do not equate with Town action."  Def.s' Mem. in Supp. at 29.  In support of this assertion, the defendant cites to Katkocin's testimony that "[t]he Board of Selectman have limited powers . . . and the Town meeting is the legislative forum of the government."  Katkocin Depo. at 17.

On the record before the court, the defendants have failed to show that there is no disputed issue as to whether or not Katkocin was an "official whose actions represent official policy."  Jeffes, 208 F.3d at 57.  However, it is equally unclear on the record before the court whether Katcokin's disciplinary powers were merely discretionary such that the exercise of that discretion "could give rise to a constitutional violation" and "the result would be indistinguishable from respondeat superior liability." St. Louis v. Praprotnik, 485 U.S. at 126.  The court is unable to determine whether Katkocin was a final policymaker as a matter of law on the record currently before it. Therefore, defendants are denied summary judgment on this ground.

**F.      Mortara's claim under Connecticut General Statute section 31-51q**

To establish a claim under section 31-51q, a plaintiff must prove that

"(1) [he] was exercising a right protected by the First Amendment to the United States

Constitution (or an equivalent provision of the Connecticut Constitution); (2) [he] was

fired on account of [his] exercise of such rights; and (3) [his] exercise of [his] first

amendment (or equivalent state constitutional rights) did not substantially or material

interfere with [his] bona fide job performance or with [his] working relationship with [his]

employer." Barlow v. Connecticut, 319 F.Supp.2d 250, 265-6 (D.Conn. 2004).[8]  The

determination of whether plaintiff was exercising his rights under the First Amendment,

or equivalent parts of the Connecticut Constitution, and whether he was fired because

of exercising those rights, is made using the same analysis for determining First

Amendment retaliation claims made pursuant to section 1983.  See Vince v. Worrell,

1992 WL 172135 at *12 (Conn.Super. 1992).

Defendants move for summary judgment on Mortara's claim under section 31-

51q on two grounds.  First, they argue that this claim fails for the same reasons that

they ague Mortara's First Amendment claims fail.  See Def.'s Mem. in Supp. at 31.

Given that the court has already rejected these arguments in determining that an issue

---

[8]Connecticut General Statute 31-51q2 states, relevant part, that
        [a]ny employer, including the state and any instrumentality or political
        subdivision thereof, who subjects any employee to discipline or discharge
        on account of the exercise by such employee of rights guaranteed by the
        first amendment to the United States Constitution or section 3, 4 or 14 of
        article first of the Constitution of the state, provided such activity does not
        substantially or materially interfere with the employee's bona fide job
        performance or the working relationship between the employee and the
        employer, shall be liable to such employee for damages . . . .  CONN.
        GEN. STAT. § 31-51q.

of material fact exists as to Mortara's First Amendment claims, the defendants' motion for summary judgment as to this count must also fail.  Second, they argue that section 31-51q cannot apply to Katkocin in her individual capacity because the statute applies only to "employers."  See id. at 32 (citing Emerick v. Kuhn, 1994 WL 622001 (Conn. Super. 2004)).  Although Mortara's Complaint states that this claim is made against "all Defendants" (see Count Ten, Complaint at 32), he abandons that claim in his own Motion for Summary Judgment.  See Pl.'s Mem. in Supp. at 31 ("On this count Officer Mortara is not bringing suit against First Selectman/Police Cheif Katkocin in her individual capacity, but rather in her official capacity as his government employer.").  Therefore, the court grants summary judgment to Katkocin in her individual capacity as to Count Ten.  Given that nothing futher has been put forth by the defendants to support a grant of summary judgment on this claim, their further motion as to Count Ten is denied.

Mortara has also moved for summary judgment on his 31-51q claim.  However, Mortara makes no argument as to how he has shown that there is no disputed issue of material fact as to the third element of this claim.  Therefore, Mortara's Motion for Summary Judgment as to this claim is denied.

### G.    Mortara's claim under Connecticut General Statute § 31-51m

Mortara brings a claim against all defendants alleging violation of Connecticut General Statute section 31-51m.  See Count Eleven, Complaint at 32.  Section 31-51m makes it unlawful for an employer, including a political subdivision of the state, to "discharge, discipline, or otherwise penalize any employee" for reporting "a violation or a suspected violation of any state or federal law or regulation or any municipal

ordinance or regulation to a public body" or for reporting "to a public body concerning the unethical practices, mismanagement or abuse of authority by such employer." CONN. GEN. STAT. § 31-51m(b). An employee alleging violation of this statute may, "after exhausting available administrative remedies, bring a civil action, within ninety days of the date of the final administrative determination or within ninety days of such violation, whichever is later." CONN. GEN. STAT. § 31-51m(c); see also Miller v. O'Meara, 2005 WL 1091048 at *4 (Conn. Super. 2005)(noting that "Connecticut trial courts have strictly adhered" to the administrative exhaustion requirement of 31-51m).

While Count Eleven of the Complaint states that "each of the events" described in the Complaint violate section 31-51m, in his Opposition to the defendants' Motion for Summary Judgment, Mortara limits his 31-541m claim to the filing of the "Prohibited Practice complaint with the Labor Board on March 19, 2004 regarding the Town's failure to provide adequate personnel to staff the Police Department, employment of State Troopers to cover shifts instead of New Fairfield Officers and the failure of the Town to comply with a memorandum of agreement to hire enough Officers to work without Police Assistance." Pl.'s Memo. in Opp. at 40.

Defendants move for summary judgment on the grounds that Mortara failed to exhaust the available administrative remedies before bringing this suit. See Def.'s Mem. in Supp. at 34-5. Mortara states in opposition that "[t]he sum total of individual disciplinary actions taken against the Plaintiff and his administrative response to them had not reached any final administrative decision at the time this suit was filed. . . ." Pl.'s Mem. in Opp. at 43. Having failed to demonstrate that there is a disputed issue of material fact as to whether Mortara exhausted available administrative remedies

pursuant to section 31-51m, the defendants' Motion for Summary Judgment as to Count Eleven is granted.

## H.    Defendant's Motion to Strike

The defendants' move to strike portions of Mortara's 56(a)(2) Statement, a transcript submitted by Mortara as evidence to support his 56(a)(2) Statement, and the entirety of Mortara's Motion for Summary Judgment because it was filed after the deadline set by this court pursuant to Federal Rule of Civil Procedure 16(b).  Def.s' Mot. to Strike at 1-2 (Doc. No. 42).

Rule 16(b) provides that a scheduling order setting out deadlines for the filing of motions "shall not be modified except upon a showing of good cause and by leave of the district judge."  FED. R. CIV. P. 16(b).  The court finds that Mortara has made a showing of good cause as to why the motion was filed late and thus the court has reviewed Mortara's Motion for Summary Judgment as if it had been timely filed.  See Pl.'s Mot. in Opp. to Motion to Strike at 3-5 (documenting good cause for late filing)(Doc. No. 46).

Defendants move to strike many paragraphs of Mortara's 56(a)(2) Statment and Exhibit One of his 56(a)(2) Statement.  In deciding the cross motions for summary judgment which are the subject of this Ruling, the court relied on only one paragraph of Mortara's 56(a)(2) Statement that defedants move to strike and did not rely at all on Exhibit One.  Therefore, defendants' motion to strike is denied as moot as to all of the material they identify with the exception of paragraph 57.

In deciding these motions, the court relied, in part, on the letter from Sergeant Wagnblas to the police officers of the Town of New Fairfield dated, October 12, 2004,

and cited as support for Mortara's denial of paragrah 57 of defendants' 56(a)(1) Statement.  <u>See</u> Pl.'s Mem. in Supp. Ex. 1, Complaint Ex. 22, and Pl.'s 56(a)(2) Stat. at ¶ 57. Defendants move to strike paragraph 57 of Mortara's 56(a)(2) statement because they argue that he has "failed to cite any admissible evidence in support of his denial." However, defendants cite no case law, rule of evidence, or other authority based on which they ask the court to find the evidence relied on by Mortara in paragraph 57 inadmissable.  <u>See</u> <u>Newport Electronics, Inc. v. Newport Corporation</u>, 157 F.Supp.2d 202, 208 (D.Conn. 2001)("The moving party . . . must set forth reasons why the materials should not be considered by the court.").  Seeing no reason to discredit this document, the court denies defendants' Motion to Strike as to this document.

## IV.    CONCLUSION

For the forgoing reasons, Plaintiff's Motion for Summary Judgment as to Liability (Doc. No. 33) is DENIED.  Defendant's Motion for Summary Judgment (Doc. No. 28) is DENIED in part and GRANTED in part.  Defendants' Motion for Summary Judgment is DENIED as to Mortara's First Amendment claims (Counts 1,2,4,5,7, and 8) and his claim under Connecticut General Statute § 31-51q (Count 10) as to the Town and Katkocin in her official capacity.  Defendant's Motion for Summary Judgment as to Mortara's due process claims (Counts 3,6,9) and his claim under Connecticut General Statute § 31-51m (Count 11) is GRANTED.  Defendants' Motion to Strike (Doc. No. 42) is denied.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 16th day of November, 2007.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge